# Helm v. Commonwealth.

(Decided January 13. 1914.)

## Appeal from Jefferson Circuit Court (Criminal Division).

1. Criminal Law—Evidence—Anti-Sweating Act.—Where accused when placed under arrest voluntarily and spontaneously makes a statement, without questioning, threats, extortion or other unlawful means, such confession is not within the Act of the Legislature approved March 19, 1912, entitled "An act to prevent the sweating of prisoners arrested for crime, etc.'; and same is admissible in evidence.

2. Criminal Law—Homicide—Instruction on Voluntary Manslaughter. —Where there is no evidence upon which to base it, it is not error for the court to refuse an instruction on voluntary manslaughter.

LOGAN N. ROCK, BENNETT H. YOUNG for appellant.

JAMES GARNETT, Attorney General; OVERTON S. HOGAN, Assistant Attorney General, and AARON KOHN for appellee.

OPINION OF THE COURT BY JUDGE HANNAH—Affirming.

The appellant, Logan Helm, was indicted by the grand jury of Jefferson County on April 2, 1913; tried in the Jefferson Circuit Court on June 12, 1913; and found guilty of willful murder, the jury fixing his punishment at death. He appeals.

Appellant's victim, Cornette Webb, had been married, but at the time of this tragedy was separated from her husband and was living with a friend, Nettie Johnson, at Jacob and Jackson streets, in the city of Louisville. Appellant had also been married, but was living apart from his wife. Both appellant and Cornette Webb had filed suits for divorce from their respective spouses, the suits having been instituted by the same attorney, on the same day, appellant paying the expenses of both suits. Appellant claims that he and deceased had been living together for about six months before the killing occurred. This is denied by the witness, Nettie Johnson, with whom deceased lived, who stated that although appellant came to the house almost every night, he never slept there. Deceased had promised to marry appellant when they should have

obtained their respective decrees of divorce, but because appellant's jealous nature had rendered their relations disagreeable to her, she had reached the decision that appellant would not make her a desirable husband, and that she would not marry him as she had promised. This determination she communicated to appellant, and upon her declaration of this decision, appellant threatened to kill her, saying that no one else should have her, and that he could not live without her. These threats were made on the Friday and Sunday preceding the killing. On the following Tuesday morning, deceased while on her way to her work, was shot and killed by appellant. She had started to her work in a distant part of the city, expecting as was her usual custom to board a street car at the corner of Jackson and Broadway streets, when appellant approached her, and, after a few words had been exchanged, shot her twice, one ball entering at the outer end of the right collar bone, the other an inch or two below the right nipple, the latter being a fatal wound. Appellant bought the weapon with which he did the shooting on the night before the killing. One witness testified that appellant came to the garage where witness was at work, about 5:30 on the morning of the killing, and asked if witness had seen "his girl," describing her and telling the witness that she caught a car there every morning. Witness informed appellant he had not seen her. Later, about 6:45 a. m., deceased came to the corner, and appellant approached her, said something to her, and when she replied, appellant shot her twice.

Three grounds are urged by appellant for a reversal of the judgment appealed from; (1) improper conduct of counsel for the prosecution; (2) error in permitting to go to the jury certain testimony of Police Sergeant George J. Seng; and (3) error in failing to charge on voluntary manslaughter.

It is charged that employed counsel for the prosecution was sitting near the jury during the progress of the trial, and that he wrote something on a piece of paper, and held it up before a juror to be read. What was written thereon is not alleged. This was shown by the affidavit of junior counsel for the defense together with that of another witness. This affidavit shows that the conduct complained of was at the bar in the presence of the whole court and while the trial was in progress; and while we have no

doubt that the young attorney in his zeal for his client was afraid there was something wrong in what he saw, yet to us it seems improbable that such a thing would be attempted under such circumstances. This affidavit shows that the attention of the court was called to the matter while it was going on, and it seems that the court saw nothing improper in the conduct complained of. The attorney charged with the improper conduct filed his affidavit stating that the only writing he did during the trial was in making memoranda of the evidence, and that he did not attempt to show this or any other writing to a juror. The juror named as having seen the writing says nothing of the kind occurred; that he saw no writing; and that so far as he knew there was no attempt to show him any. We have before us, therefore, nothing of a substantial nature showing any improper conduct on the part of said counsel.

The testimony of the police officer complained of is in full as follows:

"Q. You are a police officer of the city of Louis, ville?"

"A. Yes, sir, sergeant of police."

"Q. Where were you on the morning of the 18th of March about the time of this killing?"

"A. About 7 o'clock I was at the Fifth Police District Station, and I got a telephone message that there was somebody killed at Jackson and Broadway."

"Q. Did you go there?"

"A. I got in the machine and got over there—it took about four minutes to get over there—and found this Cornette Webb lying on the northeast corner of Broadway and Jackson streets in Dr. Corrigan's front yard with two bullet wounds in her."

"Q. Did you see this defendant, Helm?"

"A. Yes, sir, there was a man holding him there, a man by the name of Wonderlin."

"Q. Did you find him?"

"A. Yes, sir."

"Q. Did he make any statement to you about this matter?"

"A. Yes."

"Q. What was it?"

"A. He told me this woman and he had had some— that he had been going with this woman; and he went

there a few days before that and he found another negro man in the house, and he asked this woman who the man was and she refused to tell him; and he said they had more trouble ever since then; that he had bought her a sewing machine and he had paid on it, and he wanted her to take the receipts and finish paying for the sewing machine, or give it back to the people he had bought it from, and he had went up there to have a settlement with her, and shot her and shot her twice, and he says, the crowd commenced gathering around there and he throwed the pistol up in the air and shot in the air then, and then he fell down on the ground.''

''Q. He told you he had shot in the air when the crowd gathered?''

''A. When the crowd commenced gathering around.''

''Q. Then he fell down?''

''A. Yes, sir.''

''Q. Was there any wound on his person at all?''·

''A. No, sir.''

''Q. Was he injured in any way?''

''A. No, sir.''

''Q. Did you see the hat?''

''A. There was a hole in his hat.''

''Q. A bullet hole in the hat; what part of the hat?''

''A. It was along the rim—along the edge of the rim.''

''Q. There was no injury to his person at all?''

''A. No, sir.''

''Q. He told you he had shot in the air?''

''A. Yes, sir.''

''Q. Did he tell you why he shot in the air?''

''A. He said the crowd commenced to gather, and· he began to get afraid, and he just shot up in the air. I asked him did he try to kill himself; he said no.''

There was no cross-examination of the witness.

It is contended by appellant that this testimony should not have been allowed to go to the jury because of the Act of the Legislature approved March 19, 1912, entitled ''An Act to prevent sweating process of prisoners arrested for crime, etc.'' In that Act, ''sweating'' is defined as ''the questioning of a person in custody charged with crime, in an attempt to obtain information from him concerning his connection with crime or knowledge thereof, after he has been arrested and in custody as stated, by plying him with questions, or by

threats, or other wrongful means, extorting from him. information to be used against him as testimony upon his trial for such alleged crime." It will be seen that this statement was made by appellant to the officer voluntarily and spontaneously, and without questioning by said officer. The testimony is, therefore, not within the Act in question. In the case of the Commonwealth v. McClannahan, 153 Ky., 417, this court said: "We do not mean to hold that a voluntary confession may not be made by one charged with crime and under arrest, or such confessions have often been admitted, and will still be admitted by the courts as competent, etc." In this case, there is nothing to indicate that appellant's statement was obtained by questioning, threats, extortion or other wrongful means. The record shows but one question was asked by the officer, and that was: "I asked him did he try to kill himself." This came after appellant had made the statement above set out; and was doubtless asked in order that the officer might understand appellant's purpose in shooting into the air and falling upon the ground. Appellant contends that this part of the officer's testimony was highly prejudicial because it contradicts appellant, he having been asked if he did not make such a statement, and denied making it. It is evident that the question was not asked by the officer for the purpose of obtaining information to be used against appellant as testimony upon his trial. There was no "plying with questions" within the meaning of the Act. The question moreover, was about a matter not directly connected with the fact of the killing. The testimony objected to, therefore, was a voluntary confession, not within the Act to prevent "sweating of prisoners," and was properly allowed to go to the jury.

Appellant's next contention is that the court should have charged the jury upon manslaughter. Appellant was asked on his examination in chief, as follows:

"Q. When you did this shooting, tell the jury how you came to shoot this woman, why you shot her?"

"A. I loved her; I loved her better than I loved myself. She promised me she was going to marry me. I had forsaken my mother, brothers, sisters, and a number of my friends for her. The morning she told me she was going to give me up for somebody else, I lost all control of myself. I even tried to shoot myself."

"Q. What was the effect on you when you learned that this woman had decided to abandon you and turn you out?"

"A. The effect on me was I deprived myself of my home, my love for my mother, the same as we all have, and then had been thrown down by her."

Upon his cross-examination, appellant was asked what was said between them before he commenced shooting, and answered:

"A. I said to her, 'Cornette, it is positively true that you are going to give me up for some one else'— just as I made the statement to the gentlemen of the jury—"

"Q. What did she say? A. She said yes. Q. Then you commenced shooting, is that right?" A. After I had finished my conversation which lasted about between two or three minutes probably. Q. What else did you say? A. What else did I say to her at the time? Q. Yes. A. I don't know; I don't remember anything else."

In Bowlin v. Commonwealth, 94 Ky., 395, this court said:

"In fact, it is not the province of the lower court any more than of this, to *weigh* evidence for the purpose of determining whether a person on trial for his life is entitled to an instruction as to manslaughter; but if there is *any* evidence tending to show the homicide is of the degree of manslaughter the accused is entitled to an instruction upon that hypothesis."

Upon the authority of the Bowlin case and the testimony of appellant above set forth, counsel for appellant contend that he was entitled to an instruction on voluntary manslaughter; that there is in the testimony referred to *some* evidence tending to show that the homicide was of the degree of voluntary manslaughter.

Voluntary manslaughter is the unlawful killing of another intentionally, but in sudden heat of passion, due to adequate provocation, and not with malice. As stated by Bishop in his work on Criminal Law, p. 697, "To negative malice, it must be sudden and reasonable provocation, and it must proceed from what the law deems adequate cause." In other words, where there is no evidence of premeditation or other proof of malice, proof of reasonable and adequate provocation will negative malice, and entitle accused to the benefit of an instruction on manslaughter.

The nature of the provocation which the law deems a/dequate to negative malice has been variously described. In Cook v. Commonwealth, 8 R., 872, this court said:

"No instruction should ever be given unless based upon an hypothesis supported by some evidence. In this instance, there was no combat between deceased and appellant. There was so far as the evidence discloses no demonstration or offensive movement whatever upon the part of deceased. Because of offensive words spoken by him, appellant crushed his skull with an axe resulting in death. The person of appellant was at no time in danger. There was no legal provocation to reduce the offense from murder to manslaughter. Says Wharton 'Words of reproach howsoever grievous, are not provocation sufficient to free the party killing, from the guilt of murder; nor are indecent, provoking actions or gestures, expressive of contempt or reproach, without an assault upon the person.' This rule is well settled. The peace of society and the safety and value of human life will not admit of a different one. The facts of this case did not authorize an instruction on manslaughter."

In Chambers v. Commonwealth, 6 R., 448, this court said: "If a person permits his passions to be inflamed by something which is not a *legal provocation,* and while under the influence of such passion and moved thereby he kills, he is guilty of murder."

The sufficiency of provocation to extenuate murder is generally a question of law. 21 Cyc., 1028. In other words, it is for the court to say whether there is *any* evidence of legal provocation. If there is, then it is not for the court to attempt to determine the degree, or to estimate the value of such evidence. The court must then act without weighing it, but there must be some evidence before he can act.

To support the defense of legal provocation and entitle accused to an instruction on voluntary manslaughter, the evidence offered by him on that issue must be of such character that, if taken and considered as absolutely true, and without considering any evidence in contradiction thereof, it would authorize the jury to return a manslaughter verdict.

To determine whether there was any such evidence in the case at bar, it is only necessary to consider the

evidence of appellant himself, and that of William Watson, whose testimony as given upon the examining trial, was offered by appellant and read by consent of the Commonwealth upon the trial herein. This statement is as follows: "Wm. Watson (Commercial Motor Car Co., Jackson & Broadway) about half past five or quarter to six, Logan came in the garage where I worked at, and asked me if I had seen his girl, and I had just went to work there that night, and told him no; and he went ahead and told me what kind of a looking girl she was and what she wore, and told me she caught a car there every morning. He was there a little bit before, but didn't say anything about it. About 20 minutes to seven, I walked to the front door, and he came to the front door as I did. And there was a bakery right opposite to the garage, and I was going over there to get something; and the girl came about a quarter to seven; and he started across, and I got to the bakery door and stopped to see if that was the girl, and she stepped up on the sidewalk, and as she turned around, he asked her a question, but what it was I don't know; and she answered him back, and I don't know what it was. And he pulled out the revolver from his overcoat pocket and shot her twice, and he shot at himself once, and it went through his hat and he fell; and he threw the revolver down, and he saw he was not shot, and he started for the gun, and I broke the gun and threw the loads in the street, and I picked up the girl, and asked somebody to help me to hold her, and the officer came and he took charge of him; and I handed him the gun. That is the gun. She didn't have any weapon of any kind."

It will be seen from the evidence of appellant himself and this witness that there was no provocation for the killing; that from appellant's own testimony, the only cause that prompted the killing was his disappointment and chagrin because of the refusal of deceased to resume their relations, and to marry him when that should become possible. This disappointment may have excited his passions, and thrown him into a violent rage, but it did not in law constitute provocation and thereby entitle him to an instruction on voluntary manslaughter, and the lower court properly refused to charge the jury in that respect. Cottrell v. Commonwealth, 13 R., 305; Cook v. Commonwealth, 8 S. W., 872, 10 R., 222.

The jury which tried appellant has fixed his punishment in the severe measure of the Mosaic statute. In the court below, and in this court by oral argument and by brief, appellant has had the unremitting efforts of able and distinguished counsel, presenting his case with commendable zeal and rare earnestness. He has had the benefit of every safeguard which the strong arm of the law throws in protection around all persons accused of crime. He has been fairly and impartially tried and convicted according to the law of this Commonwealth. The evidence—in fact his own testimony—convicts him of a willful murder, without any extenuating circumstances, and the jury was fully justified under the law and the evidence in fixing his punishment at death.

There are no errors in the record and the judgment is affirmed.

Whole court sitting.