## Hall v. Commonwealth.

(Decided March 19, 1935.)

FRED STARCK for appellant.

BAILEY P. WOOTTON, Attorney General, and RAY L. MURPHY, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY CREAL, COMMISSIONER— Affirming.

The grand jury of Jefferson county returned a joint indictment against Willard Hall, Calvin Tate, Gilbert Gibbs, and Leo J. Tesner, charging them with the willful murder of Samuel Horine, and on separate trial the former has been found guilty of the crime charged in the indictment and his punishment fixed at death. His motion for a new trial having been overruled, he is prosecuting this appeal.

The principal grounds relied on for reversal are: (1) That the lower court erred in refusing to grant a continuance and in not granting a new trial on this ground; (2) that the court committed prejudicial error in not properly instructing the jury. Some question was made in the court below concerning newsboys being permitted to enter the courtroom while jurors were being examined and exhibiting in their presence newspapers giving accounts of the court proceedings and of the crime for which appellant was being tried, and also concerning alleged misconduct upon the part of the attorneys for the commonwealth, but little is said in briefs concerning these matters.

On Friday night, June 15, 1934, about 9 o'clock, two men armed with pistols entered a filling station at Cypress and Woodland streets, operated by a man named Schroering. One of them shot and killed Mr. Schroering, and, after procuring the cash in the money drawer and upon leaving the station, they fired a number of shots at people who had been attracted to the scene by the shooting, and a man by the name of Carter and Samuel Horine were shot and killed.

The witnesses to the tragedy testified that one of the men who committed the robbery and did the shooting was tall and the other was short, and it later developed that Calvin Tate was the tall, and appellant the short man referred to by witnesses. It is shown by undisputed and positive evidence that Mr. Horine was shot by appellant while he and Tate were running away from the filling station. Appellant was armed with a .44-caliber pistol and Tate with a .38. Immediately after the tragedy a letter addressed to Tate was found on the floor of the filling station, and, with this lead, he was arrested about 11 o'clock, and the officers gained

information which led to the arrest of appellant at his home at 136 South Forty-Fourth street between 4 and 5 o'clock the next morning. After appellant was arrested and taken to the police station, he made a statement of everything that occurred in connection with the tragedy. This was reduced to writing and was signed by him in the presence of Elmer L. Smith, a notary public, and a number of police officers. The written statement as shown by the evidence reads:

"June 15, 1934, about 4 P. M., Gilbert Gibbs and Leo Tesner come to my home and they told me that they had some places lined up to hold up and asked me if I wanted to make some money and go along with them, and I told them I would go with them. We stayed there a few minutes and left and went to Tesner's home at 636 S. 2nd St. and we stayed there till about 5:30 P. M. and Gibbs and Tesner told me they were supposed to meet Calvin Tate on 3rd St. in the 400 block. We went there about 6 P. M. and met Tate. Tate got in the car with us and us four drove down in the west end, this was shortly after 6 P. M. Gilbert Gibbs got a pint of whiskey and we all drank some of the whiskey and went to 2nd and Gaulbert and went in a soft drink stand and Tate drank several glasses of beer and I took a drink of whiskey and we all four stayed there till 7 P. M. We come in to 2nd and Market and Tate and me got out of the car and Tesner and Gibbs drove on over to 2nd and Jefferson where they knew a boy that works in the filling station. They went over there to look the place over and they wanted me and Tate to stick the filling station up. About 20 minutes later me and Tate met Tesner and Gibbs on 2nd St. between Market & Jefferson and we got into the car and drove down in the west end and looked over several filling stations to pick out one to hold up later on in the night. We drove around until about 9 o'clock and then we went within about a half a block of Cypress & Woodland Ave. where there is a filling station and parked our car and Tate and I got out of the car and Tesner and Gibbs stayed in the car and they said they would wait for us until after we pulled the holdup. Me and Tate went over to the filling station at Cypress and Woodland and we both went into the station and there was

only one man in the station and we both had our guns out and Tate told the man in the filling station to hold his hands up and the man reached for his pocket and I fired one shot at this man and he fell to the floor and he said he was shot, and Tate pulled some of the drawers out and I run out first and Tate come out in back of me, and we both still had our pistols in our hand and when he came out of the station a man with a light suit grabbed at me and I shot at him and run up Woodland Ave. with Tate and I hollered for several people to get out of the way and a heavy set man tried to stop me and I fired a shot at him. I don't know whether Tate fired any shots or not. But just before we got into a cab at 18th and St. Louis, Tate told me he fired some shots. We went to 3rd & Broadway in the cab, and got out and we went to some place on 3rd St. and stayed there a few minutes and then went to Pap's place on Preston St. between Gray and Chestnut Sts. and we sit down at the table and had a glass of beer and two men called Tate outside and I thought they were detectives and I went out the front way and left and went home. And the police arrested me between 4:30 and 5 A. M. The pistol I shot these men with is a 44 caliber S. & W. which was given to me by Tesner yesterday evening at his home. On my way home last night after the holdup and after I shot these men I was going down an alley between 20 & 21st Main and Market and a man got out of a car in this alley and bumped into me and we got into an argument and I was pretty drunk and him and another man followed me to 22nd & Market and one of these men had a gun and he hit me in the head and took my gun away from me. Then I went home. I have known Gilbert Gibbs for about two years and I was introduced to Tesner and Tate by Gibbs yesterday at my home. I only fired three shots at the scene of the holdup. I read this statement before I signed it and the same is the truth and I made this statement without any threats or promises.''

Appellant testified that a friend by the name of Gilbert Gibbs and a man named Tesner came to his home where he was cutting grass late in the afternoon of June 15th, and Gibbs said he thought they could get a job at Sixteenth and Hill at some tobacco factory;

that he got in the automobile with them, and they started out and went to the Tesner boy's house, where he shaved; that later Tesner said they would go down and get Tate and drive around; that they picked up Tate and drove from place to place and engaged in drinking; that they finally went out to some place on Second street and drank some whiskey and beer and were pretty well drunk; that he had no further recollection of anything that occurred until he was arrested at his home the next morning. He admitted his signature to the statement made in police headquarters, but indicated that he was excited and disturbed and that his mind was still beclouded. After leaving the scene of the robbery and killing, appellant and Tate went to a grocery conducted by Mrs. Lorella Shaaf at 1359 South Eighteenth street, where they asked permission to use her telephone to call a taxi. Tate went to the telephone, and appellant asked her the number, and she replied that it was right over Tate's head and he was looking right at it, when appellant replied, "We are calling a taxi," and she then told him the number of the house. When asked whether either of the men were drunk, she said, "He looked like he was pretty full," but, when asked if he was drunk, replied that she could not say.

W. R. Smith, a taxi driver, testified that he got a call to go down to 1359 South Eighteenth street a little after 9 o'clock to get two men; that, when he arrived, they asked him if 75 cents would take them to Third and Broadway, and he told them that the fare would be 45 cents; that, when they arrived at Third and Broadway, they handed him 50 cents and said, "O. K. buddy, keep the change," and walked across the street.

Minor Offut, who lives at 1250 Crop street, testified that about 11 o'clock on the night of June 15th, while turning in at Twentieth and Crop, he passed appellant; that, when he arrived at home, he pulled up and parked at the side of the stable where he lived and sat in his automobile smoking a cigarette; that, when appellant came up, he stuck a pistol in his side and told him to get out; that he searched him, taking 40 cents and his straw hat; that he ran up stairs and got a pistol and started to fire at appellant as he went out the alley, but the pistol had no loads in it; that he got in his automobile and followed appellant, overtaking him at Twenty-Second and Market streets, and,

when he accused appellant of taking his things, the latter said, "Buddy you got me wrong," and attempted to get a pistol out of his shirt; that he struck appellant over the head with his pistol and took appellant's pistol away from him. He testified that in the melee he had grappled and pulled appellant up close to him and that appellant was not drunk and he could not detect any odor of liquor on his breath. He took appellant's pistol home with him, where it was later found by the police officers after appellant had told them that a man on Crop street had taken his pistol and led them to the place where Offut said appellant held him up and robbed him. More will be said concerning the evidence in discussion of the grounds relied on for reversal.

Tate has been tried and convicted for the murder of Mr. Carter, and on appeal to this court the judgment of conviction carrying the death penalty has been affirmed by an opinion rendered on March 1, 1935. Tate v. Commonwealth, 258 Ky. 685, — S. W. (2d) — . In that case the same grounds concerning the refusal to grant a continuance and the minor matters complained of in appellant's brief were fully discussed and decided adverse to his contention, and reference to that opinion saves the necessity for further discussion of those grounds. In that case, as in this, it was contended that the evidence of the intoxication of the accused at the time of the homicide was admissible as bearing on the question of malice, and, in view of such evidence, appellant was entitled to an instruction on that issue and that an instruction on voluntary manslaughter should have been given. Counsel for appellant cite and rely on the cases of Vance v. Commonwealth, 254 Ky. 667, 72 S. W. (2d) 43; Graham v. Commonwealth, 200 Ky. 161, 252 S. W. 1012; Pash v. Commonwealth, 146 Ky. 390, 142 S. W. 700; Morris v. Commonwealth, 255 Ky. 276, 73 S. W. (2d) 1.

In the Tate opinion it is said:

"The question as to the effect of voluntary intoxication in criminal prosecutions arises in two ways —[a] as to the right of the defendant to introduce evidence thereof, and [b] as to the duty of the court to instruct the jury thereon, and pointing out to it the effect to be given such intoxication."

As further indicated in that opinion, we are only

concerned with the latter phase of the question involving the alleged error of the court in failing to give an instruction embracing the theory of intoxication, since all evidence offered by appellant as to his condition with reference to intoxication was permitted to go to the jury. Reference is also made in the Tate opinion to the confusion and lack of harmony in authorities, including the opinions of our own court, as to when such instruction should be given, and cases bearing on that question are cited and discussed at length, and excerpts from Brennon v. Commonwealth, 169 Ky. 815, 185 S. W. 489, 492, and Hayes v. Commonwealth, 171 Ky. 291, 188 S. W. 415, 418, are quoted. In the Brennon Case it is said:

> "Before, however, a court is required or justified in giving an instruction, which submits a defense to a jury for its consideration, there must be evidence upon which to base such an instruction.

> * * * The appellant was the only witness who gave testimony as to his mental condition at the time. There was no one who could so certainly know his mental condition as he knew it, and if he failed to state facts showing that he was too drunk to know his acts and their quality, it follows conclusively that he did not bring himself within the right to rely upon such a defense for his acts. There is a large difference between being drunk and being drunk to such an extent as not to know the acts one commits or their quality."

And in the Hayes Case it is said:

> "The defendant may have been drunk, but nevertheless, judging from his evidence, he knew everything that he did as well as the things that he did not do, and attempted to establish by his evidence every fact necessary to show his innocence of the crime charged. He had sufficient sense and discretion to arrange a plan for getting in the house and to escape when discovered, and to take off his shoes and put them in his pocket so that he would make no noise in walking. A criminal who has sufficient mind and memory to give a connected narrative of everything that happened and to relate in detail all the facts and circumstances that might excuse his conduct is not in a good position to insist that

he was entitled to an instruction on the subject of drunkenness merely because he testifies that he was drunk.''

The difference between this and the Tate Case is that in the former the accused went upon the witness stand and narrated in detail all that occurred, which was in harmony with the statement he had previously made to police officers, while here the accused denied all knowledge or recollection of what occurred at the scene of the tragedy and the events leading up to and following it. However, on the following morning he made the detailed statement of all that occurred at the filling station, and not only so, but gave them facts concerning the pistol taken from him by Minor Offut, which information led to the recovery of the pistol and officers could not have obtained these facts in any other way. While the evidence of appellant's mother and his brother indicate that he was intoxicated when he arrived home and when arrested by the officers the next morning, the arresting officer and a number of others who saw him in the district office and at police headquarters testified positively that he was sober and there was no odor of liquor about him and that he did not have the appearance of a man who had been drunk the night before; that he made his statement voluntarily and without any threats, coercion, or force upon their part; that he was merely asked if he desired to make a statement, and he replied that he did. In addition to the evidence of police officers, a newspaper reporter testified that he talked with appellant the next morning, and the latter made a statement to him in substance the same as the written statement made at police headquarters. Evidence as to the acts, conduct, and conversation of appellant at the time and subsequent to the commission of the crime with which he is charged so refute and belie his claim of intoxication as to render his evidence and the evidence of others to support that claim of no probative value.

In the case of Harris v. Commonwealth, 183 Ky. 542, 209 S. W. 509, 510, the failure of the court to give a voluntary manslaughter instruction based on evidence of intoxication of the accused at the time of the homicide was one of the grounds relied on for reversal. The court reviewed at length the acts and conduct of the accused, and held in effect that it was so utterly

at variance with his claim of intoxication as to render his evidence to sustain that claim of no probative value. Concerning that feature of the case it was said:

'It is the province of the court, of course, to determine whether or not there is any evidence to support any particular theory of a case [Helm v. Commonwealth, 156 Ky. 751, 162 S. W. 94], and in so doing to reject as of no probative value a statement of alleged facts inherently impossible and absolutely at variance with well-established and universally recognized laws. Louisville & N. R. Co. v. Chambers, 165 Ky. 703, 178 S. W. 1041, Ann. Cas. 1917B, 471.''

It was held that in the circumstances the court did not err in refusing to give the manslaughter instruction.

Out of the confusion and conflict of authorities on this question, and in substance as summed up in the Tate Case, we conceive the rule to be that, to be available as a defensive plea and to warrant an instruction on a lesser degree of the crime of murder, intoxication must in any event be of such extent and degree as to deprive one of the powers of reason and to render him incapable of appreciating the nature or quality of his acts and deprive him of the ability to entertain malice or criminal intent. In other words, it must amount virtually to insanity. One who is capable of conceiving a plan of robbery and carrying it out and making his escape, and soon afterwards detailing minutely all of his acts and conduct, is not in a position to claim that at the time he was, because of intoxication, so bereft of reason as not to know the nature or quality of his acts.

In the light of the evidence, we are constrained to hold that the court did not err in failing to give an instruction as to the effect of intoxication or a manslaughter instruction based on the evidence of appellant's intoxication. As already indicated, the other grounds relied on by appellant grew out of exactly similar circumstances and conditions as the other grounds relied on in the Tate Case and were decided adversely to him.

Perceiving no error in the record prejudicial to appellant's substantial rights, the judgment is affirmed.

Whole court sitting.