THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* EMILIO RIVERA VALENTÍN, Defendant and Appellant.

No. 14162.   Argued November 7, 1949.—Decided November 22, 1949.

*Santos P. Amadeo* for appellant.   *Vicente Géigel Polanco, Attorney General, J. Rivera Barreras, Fiscal of the Supreme*

*Court* and *Fernando Fornaris, Jr., Assistant Fiscal,* for appellee.

MR. JUSTICE NEGRÓN FERNÁNDEZ delivered the opinion of the Court.

Emilio Rivera Valentín was sentenced to life imprisonment after having been tried by a court without a jury, as requested by him, and convicted of a crime of murder in the first degree. In his appeal to this Court he assigns as the only error that the evidence presented by the prosecution did not justify the conviction of murder in the first degree since "the appellant did not commit the crime with malice aforethought due to his state of intoxication" and prays that the judgment be reduced to murder in the second degree and the case remanded to the lower court so that the latter "impose the penalty fixed for the crime of murder in the second degree".

The evidence presented by the prosecution showed that defendant lived in concubinage with Carmen Teresa Amador, who on the night of June 9, 1948 was in a bar owned by Dámaso Ramos on Caparra Street in the town of Cataño drinking beer in the company of three friends. Defendant arrived at the bar and went to that part where at the time his concubine was dancing with one of her three escorts, and immediately kicked her in the stomach. When he kept hitting her, the owner interfered and told her to run and that defendant was going to kill her, and she jumped over the fence next to the bar, while Dámaso Ramos and a son of his, and two of the escorts of the woman threw defendant, who "was too intoxicated and enraged", out to the street. When he was in the street defendant took out a knife from his shirt, challenging and insulting the persons who had interfered with him. Ricardo Correa Santos, one of the escorts of the Amador woman who had not interfered with defendant before, advised him and tried to persuade him to go away from there, "not to do anything more" since everything had

already ended, and while walking with defendant the latter stabbed him with the knife. Correa Santos fell to the floor and died almost immediately. Defendant threw the knife over the top of the house in which the bar was located and ran towards his house next door. Correa Santos, the victim, was not the person dancing with the Amador woman when defendant entered the bar. While defendant was being taken out to the street, he fell against a concrete column within the premises, receiving a blow on his head.

The evidence for defendant, announced not to be predicated on the theory of self-defense as repeatedly stated by his counsel, was to the effect that upon being arrested half an hour after the occurrence by Corporal Berríos of the Insular Police, defendant showed a contusion on the forehead. Defendant according to his own testimony lived with the Amador woman with whom he had been "angry" for about ten days. He had forbidden her to visit the bar of Dámaso Ramos. That evening, defendant came out from his home and stopped to buy cigarettes at another bar, the "Happy Land", where he drank "one beer". Subsequently, he came into the bar of Dámaso Ramos "to take my woman out of there" and upon finding her dancing took her by an arm in order to take her with him and that at that moment Dámaso Ramos, his son, and Correa Santos attacked him. The three of them, according to defendant, "hit him", Dámaso and his son with bottles and Correa Santos with a piece of pipe, the latter being the first one who struck him and that when defendant fell to the ground they kicked him. When he saw that Dámaso Ramos was approaching him with a knife, he seized the knife from him and threw it, but did not know whom he had stabbed. He testified, however, that he stabbed Correa Santos "right at the door of the bar" and not on the street, and that subsequently he ran and surrendered himself. According to defendant he was "unconscious" when the facts occurred.

Even assuming that the mere conclusions of the witnesses considering defendant as being "in a state of intoxication", "staggering from drunkenness", "too drunk"—without explaining in any manner whatsoever the motive, basis, or justification for these conclusions—are sufficient evidence to establish that a person is in fact in a state of intoxication, there is nothing in that evidence to show that the intoxication of defendant was of such a degree that rendered him incapable of forming in his mind, deliberately and with premeditation, the intent to kill Correa Santos. On the contrary, the evidence in general and particularly the testimony of defendant showed with great eloquence that his alleged "unconsciousness" or drunkenness did not prevent him from appreciating with absolute precision, clearness, and detail the development of all the events; it did not preclude him from forming the purpose of taking his concubine out of the bar nor of becoming aware that, as stated by him, he was attacked with bottles and with a piece of pipe; that Dámaso Ramos approached him with a knife and that he seized it from him, and used it against those who, according to him, had attacked him; of perfectly recalling the place where he had wounded his victim—"right at the door of the bar"— even though he pretended to ignore whom he had wounded, since he was "unconscious"; and that he surrendered to the police after he had thrown away the knife and withdrawn running from the place of the occurrence.

The rule adopted in those jurisdictions where provisions of law identical or similar to that contained in § 41 of our Penal Code [1] prevail, is that drunkenness—voluntary—must

---

[1] Section 41 of the Penal Code provides:

"INTOXICATION, EFFECT OF. No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition. But, whenever the actual existence of any particular purpose, motive, or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive, or intent with which he committed the act."

be of such degree or extent that it will deprive defendant of his mental capacity to form the specific intent required by the Code for the conviction of a crime—or degree thereof—requiring such specific intent, and that the determination of that fact is essentially incumbent on the jury or on the court, sitting without a jury. *People* v. *Clifton*, 186 Cal. 143, 198 Pac. 1065 (1921); *People* v. *Murphy*, 1 Cal. 2d 37, 32 P.2d 635 (1934); *People* v. *De Moss*, 4 Cal. 2d 561, 50 P.2d 1031 (1935); *Long* v. *State*, 109 U. S. 77, 141 N.E. 691 (1923); *Commonwealth* v. *Lehman*, 309 Pa. 486, 164 Atl. 526 (1932); *Hall* v. *Commonwealth*, 258 Ky. 744, 81 S.W.2d 404 (1935); 1 Warren on Homicide, § 61; 1 Wharton's Criminal Law (12th ed. 1932) § 68; 1 Burdick, The Law of Crime (1946) ed.), §§ 167–170 and 26 Am. Jur. Homicide, §§ 118, 119, pp. 235–238.

██ Since the judge of the lower court in finding defendant guilty of the crime of murder in the first degree did not consider that his intoxication was of such degree or extent that it deprived him of his capacity to premeditate and deliberate the death of his victim, and since the law does not require a definite lapse of time for the existence and the conception of said elements of the crime of murder in the first degree—*People* v. *Román*, *ante*, p. 48—in the absence of manifest error in the weighing of the evidence or that he acted under the influence of passion, prejudice or partiality, we are not justified in interfering on appeal with his findings.

The judgment appealed from is affirmed.