El Pueblo de Puerto Rico, demandante y apelado, *v.* Emilio Rivera Valentín, acusado y apelante.

Núm. 14162.—*Sometido:* Noviembre 7, 1949. *Resuelto:* Noviembre 22, 1949.

*Santos P. Amadeo*, abogado del apelante; *Hon. Procurador General Vicente Géigel Polanco, J. Rivera Barreras, Fiscal del Tribunal Supremo y Fernando Fornaris, Jr., Fiscal Auxiliar*, abogados de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR NEGRÓN FERNÁNDEZ emitió la opinión del tribunal.

Habiendo sido convicto de un delito de asesinato en primer grado, luego de un juicio celebrado ante tribunal de derecho según lo solicitara, Emilio Rivera Valentín fué sentenciado a reclusión perpetua. En su apelación ante este Tribunal señala como único error el de que la prueba del fiscal no justifica la convicción por asesinato en primer grado, ya que "el apelante no cometió el delito con malicia premeditada debido a su estado de embriaguez", y solicita que se modifique la sentencia por una de asesinato en segundo grado y se devuelva el caso a la corte inferior para que ésta "le imponga la pena correspondiente al delito de asesinato en segundo grado".

La prueba de cargo demostró que el acusado vivía en concubinato con Carmen Teresa Amador, quien en la noche del 9 de junio de 1948 se encontraba en un *bar* propiedad de Dámaso Ramos en la calle Caparra del pueblo de Cataño tomando cerveza en compañía de tres amigos. El acusado llegó al bar penetrando hasta el sitio en que a la sazón su concubina bailaba con uno de sus tres acompañantes, e inmediatamente le dió una patada por el estómago. Al continuar pegándole, intervino el dueño, quien le indicó a ella que corriera, que el acusado la iba a matar, tirándose ella por la empalizada del lado del bar, mientras entre Dámaso Ramos, un hijo suyo y dos de los acompañantes de la Amador echaban al acusado, quien "estaba demasiado de borracho" y "armao" dentro del bar, hacia la calle. Ya en este sitio el acusado sacó un cuchillo del seno, desafiando e insultando a los que con él habían intervenido. Ricardo Correa Santos, uno de los acompañantes de la Amador, pero quien no había intervenido con el acusado

antes, le aconsejaba y trataba de persuadirle para que se retirara, que "dejara eso", ya que todo había pasado, y al caminar con el acusado éste le asestó una puñalada con el cuchillo, cayendo Correa Santos al suelo, muriendo casi instantáneamente. El acusado tiró el cuchillo por encima de la casa en que estaba situado el bar y corrió para la suya, que era al lado. Correa Santos, la víctima, no era el que bailaba con la Amador cuando entró el acusado al bar. Éste, cuando era sacado hacia la calle cayó contra una columna de concreto en el interior del local, dándose un golpe en la cabeza.

La prueba del acusado, que se anunció no estar predicada en la teoría de defensa propia, según reiteradamente expresó su abogado, fué al efecto de que al ser arrestado por el Cabo Berríos de la Policía Insular, media hora después de los hechos, presentaba una contusión sobre la frente. El acusado, según su propio testimonio, vivía con la Amador, con quien estaba "enchismado" hacía alrededor de diez días. Le había prohibido a ella que visitara el bar de Dámaso Ramos. Esa noche el acusado salió de su casa deteniéndose en otro bar, el "Happy Land", a comprar cigarrillos y donde se tomó "una cervecita". Entró luego al bar de Dámaso Ramos "a sacar de allí a la mujer mía," y al encontrarla bailando, la cogió por un brazo para que se fuera con él, y en ese momento le "cayeron encima" Dámaso Ramos, su hijo y Correa Santos. Los tres, según él, le "entraron a golpes", dándole Dámaso y su hijo con botellas y Correa Santos con un pedazo de tubo, siendo éste el que primero le dió, de frente, y al caerse el acusado le dieron patadas. Cuando vió que Dámaso Ramos venía con un cuchillo, él se lo quitó y le tiró pero no sabe a quién hirió. Declaró no obstante que hirió a Correa Santos "en la misma puerta del cafetín" y no en la carretera, y que luego se fué a correr y a entregarse. Según el acusado, él se hallaba "inconsciente" cuando ocurrieron los hechos.

Aun asumiendo que las meras conclusiones de los testigos que atribuyeron al acusado estar "en estado de embriaguez",

"cayéndose de borracho", "demasiado borracho"—sin que explicaran en forma alguna el fundamento, base o justificación para las mismas—sean suficiente prueba para establecer que una persona está, en efecto, en estado de embriaguez alcohólica, nada hay en esa prueba que indique que dicho estado de embriaguez en el acusado era de tal grado que le impidiera concebir en su mente, premeditada y deliberadamente, el propósito de matar a Correa Santos. Por el contrario, la prueba en general, y en particular la propia declaración del acusado, demostraron con gran elocuencia que su alegada "inconsciencia" o embriaguez no le impidió captar con absoluta precisión, claridad y detalle el desarrollo de todos los sucesos: no le impidió concebir el propósito de sacar del bar a su concubina, ni de darse cuenta de que, según él, se le atacaba con botellas y con un pedazo de tubo; de que Dámaso Ramos venía con un cuchillo y de que él se lo quitó, y de que lo usó a su vez contra los que según él le agredían; de recordar perfectamente el sitio en que hirió a su víctima—"en la misma puerta del cafetín"—aun cuando pretendía ignorar, por estar "inconsciente", a quién había herido; y de que se entregó a la policía luego de tirar el cuchillo y retirarse, corriendo, del sitio de los hechos.

La regla adoptada en aquellas jurisdicciones donde prevalecen disposiciones de ley idénticas o similares a la contenida en el artículo 41 de nuestro Código Penal (¹) es que la embriaguez—voluntaria—tiene que ser de tal grado o carácter que inhiba en el acusado su facultad mental para formar la intención específica requerida por el Código para la convicción de un delito—o grado del mismo—en el cual se requiera tal intención específica, y que la determinación de ese hecho es

---

(¹)El artículo 41 del Código Penal prescribe:

"*Embriaguez, Efecto de ésta.* Ningún acto cometido por una persona en estado de voluntaria embriaguez es menos criminal por haberse cometido en tal estado. Pero siempre que la existencia real de algún fin, motivo o intento determinado fuere elemento indispensable para constituir alguna clase o grado de delito especial, el jurado podrá tomar en consideración el hecho de que el acusado se hallaba entonces ebrio, al determinar el fin, motivo o intento con que cometió el acto."

574

esencialmente una para el jurado o la corte juzgadora. *People* v. *Clifton,* 186 Cal. 143, 198 P. 1065 (1921); *People* v. *Murphy,* 1 Cal.2d 37, 32 P.2d 635 (1934); *People* v. *De Moss,* 4 Cal.2d 469, 50 P.2d 1031 (1935); *Long* v. *State,* 109 O. St. 77, 141 N. E. 691 (1923); *Commonwealth* v. *Lehman,* 309 Pa. 486, 164 A. 526 (1932); *Hall* v. *Commonwealth,* 258 Ky. 744, 81 S.W.2d 404 (1935); 1 Warren *on Homicide,* sección 61; 1 Wharton's *Criminal Law* (12th ed. 1932) sección 68; 1 Burdick, *The Law of Crime,* (1946 ed.) secciones 167–170 y 26 Am. Jur., *Homicide,* secciones 118, 119, págs. 235–238.

 No habiendo el juez inferior, al declarar convicto al acusado del delito de asesinato en primer grado, considerado que su embriaguez fuera de tal grado o carácter que inhibiera en él su capacidad para premeditar y deliberar la muerte de su víctima, y no requiriendo la ley un determinado espacio de tiempo para que existan y se conciban estos elementos del delito de asesinato en primer grado—*Pueblo* v. *Román,* 70 D.P.R. 50—en ausencia de manifiesto error en la apreciación de la prueba, o de que actuara movido por pasión, prejuicio o parcialidad, no estamos justificados en intervenir en apelación con sus conclusiones.

*Debe confirmarse la sentencia apelada.*