**Darrell Gene SLAVENS, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

Court of Appeals of Kentucky.

June 9, 1972.

James J. Shannon, Jr., Richmond, for appellant.

Ed W. Hancock, Atty. Gen., Kenneth A. Howe, Jr., Asst. Atty. Gen., Frankfort, for appellee.

MILLIKEN, Judge.

This is an appeal of convictions for a bizarre series of crimes committed on and along Interstate 75 in Madison County on June 19, 1971. We affirm the convictions.

The appellant, Slavens, and three companions—two women and Junior Grant (alias John R. Day)—were convicted, the women after guilty pleas to specific

charges against them, and Slavens and Grant after trial by jury. Only Slavens has appealed. Slavens was given thirty (30) years on each of two counts of armed robbery, twenty-one (21) years for malicious striking and wounding with intent to kill, and five (5) years for carrying concealed a deadly weapon, the sentences to run concurrently. A charge of assault and battery was dismissed.

This criminal binge started on Interstate 75 south of Berea early in the morning when the driver of a trailer truck attempted to pass the white Ford driven by Slavens. Slavens fired a pistol shot at the truck, shattering the glass of the cab door, fortunately not hitting the driver who discreetly dropped back, took the license number of the Ford and awaited his opportunity to report to the police. When the truck reached Berea, the driver saw the Ford being re-fueled at Gabbard's filling station, called the police station and the Chief of Police came to the gas station immediately.

The Chief arrested Slavens, ordered the women out of the car, and helped Slavens push the Ford away from the gasoline pumps. When Slavens wanted to get a cup of coffee, the Chief said, "Hell, no," and promptly handcuffed him. At this juncture the Chief saw a shoe protruding from under a quilt on the back seat of the Ford and, expecting to find the body of a shooting victim, he pulled off the cover and found himself facing the pointed pistols in the hands of Junior Grant and heard a sulfurous threat to kill him. The Chief was slugged on the back of his head by Slavens and severely pistol-whipped by Junior Grant, breaking the officer's jaw, knocking out his teeth and beating him into unconsciousness. The operator of an adjacent filling station saw the beating from his office window, ordered his son to call the police, grabbed his rifle and fired at the departing Ford. The Chief testified that prior to his being struck from behind, he had glimpsed a gun in Slavens' hand.

After abandoning their car, the four went to the farm of Earl Gross in Madison County where Slavens approached Mrs. Gross, drew his pistol and ordered Mrs. Gross to get them some clothes and took her to the barn to dress a severe cut on the head of Junior Grant. After this ministration, Grant cut the Gross' telephone line, Slavens commandeered one of the family's automobiles, ordered Gross and his daughter into the car at gunpoint, and drove off. No member of the Gross family was physically harmed, but they were kept in fear by the flourished weapons and threats. The father and daughter and the car were released in Clark County. Slavens offered the daughter $10 for the clothes, which she refused to accept. Slavens and his colleagues were found about 5 P.M., asleep in a barn on the Tunney farm near the Clark and Fayette County line, a short distance from where they had left the hostages and the car. The slumbering Slavens lay with his and the Chief's pistols in ready reach, and the sleeping Grant had his pistol in equal readiness.

■ Confronted with such an array of direct evidence against his client, counsel appointed for the appeal has ingeniously tackled his difficult task, perhaps made even more difficult by the meticulously revealing record commendably preserved by the trial court—a transcript which portrays minutely what occurred both before the jury and before the court in chambers. Ignoring any possible oversights of appointed trial counsel to raise objections, suffice it to say that the evidence is so clear and convincing that it justifies the convictions. While the motive of Slavens and Grant in slugging the Chief at the filling station may have been to break their arrest, they nevertheless took the Chief's property—his pistol and his car keys and parking meter keys, which they certainly did not do with the officer's consent.

KRS 433.140 declares: "Any person who commits robbery or burglary or any act penalized by KRS 433.130, and in committing the act *uses* or displays any pistol, gun or other firearm or deadly weapon shall be punished by confinement in the penitentia-

ry for not less than ten years or for life, or by death."

 There is no question that Slavens "used" a pistol or a deadly weapon when he slugged the Chief from behind. When the officer applied the handcuffs to Slavens he saw no pistol in his possession, but he saw one later in Slavens' possession, just before he was struck by Slavens from behind. The operator of the adjacent filling station saw Slavens strike the officer with a shining object which he could not determine was a pistol from his point of observation, but which may have been the handcuffs shining in the sunlight. In any event, it is apparent that Slavens and Grant were acting in malevolent concert at the time and the jury was justified in inferring intent or willingness to kill the officer from their willful and cruel conduct. There is no validity to the contention that they would have shot the officer had they intended to kill him, for Grant and he were charged with malicious striking and wounding with a pistol with intent to kill, not malicious shooting and wounding with intent to kill. The jury also was justified in concluding that Slavens had a pistol concealed on his body at the time of his arrest, the pistol which the officer saw in Slavens' hands just before he was struck by Slavens. In addition to this evidence that Slavens carried concealed a deadly weapon, he did not display his pistol to Mrs. Gross when he approached her at the Gross farm, but only after he reached her did his pistol appear.

It is apparent that Slavens had imbibed some alcohol, but it is far from apparent that he was drunk and did not know what he was doing. In such circumstances, the trial court properly refrained from instructing on intoxication as a possible mitigation of the offenses charged. Tate v. Commonwealth, 258 Ky. 685, 80 S. W.2d 817; Hall v. Commonwealth, 258 Ky. 744, 81 S.W.2d 404.

So far as concerns counsel's request for re-imbursement by the state of expenses incurred in the preparation of the appeal of the indigent, Slavens, we continue for the present to adhere to our policy as pronounced in Jones v. Commonwealth, Ky., 457 S.W.2d 627 (1970) and prior decisions cited therein, and hence deny the request.

The judgments of conviction are affirmed.

All concur.