EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* JUAN BELMONTE COLÓN, acusado y apelante.

*Número:* CR-76-192          *Resuelto:* 31 de mayo de 1977

*César Andréu Rivas,* abogado del apelante, *Roberto Armstrong, Jr., Procurador General Interino,* y *Josefa A. Román García, Procuradora General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR DÁVILA emitió la opinión del Tribunal.

Al no aceptar el Ministerio Público la declaración de culpabilidad del apelante por el delito de homicidio voluntario y habiendo renunciado a que el caso se viera ante un jurado, se celebró el juicio por tribunal de derecho al solo efecto de determinar la calificación del delito.

"Suscintamente expuesta en sus aspectos fundamentales la prueba de cargo demostró que para el 21 de mayo de 1974, el acusado-apelante quien era jinete en el Hipódromo El Comandante vivía con su esposa Bethzaida Burgos y sus dos hijos en la Urbanización Country Club. Ese día su esposa fue con los niños a peinarse a un salón de belleza. Allí estuvieron desde las dos de la tarde hasta las siete y media u ocho menos cuarto. Una de las personas allí presentes le pidió a la señora Burgos que le hiciera el favor y llevara a la testigo de cargo, Haydée Rodríguez de García, a su casa. La occisa cogió una fiambrera y salieron en su carro, un Barracuda, color vino. La testigo de cargo, señora Rodríguez de García ocupó el asiento del frente al lado de la occisa y los dos niños se fueron en la parte de atrás. Cuando salieron la señora Bethzaida Burgos le explicó a la testigo de cargo que antes de llevarla a su casa iban a llevarle una comida a su esposo, que debía estar rebajando y debía estar cansado. Al llegar a la residencia del acusado-apelante encontraron dos o tres carros estacionados frente a la casa por lo que ella se tuvo que estacionar al otro lado de la calle, pero frente a la casa. Eran entre las ocho menos cuarto y las ocho de la noche. La señora Bethzaida Burgos apagó el carro y ya que se iban a bajar del mismo llegó el acusado-apelante introdujo la mano por la ventanilla

donde estaba sentada la testigo de cargo y le disparó tres tiros a su esposa. Las detonaciones afectaron el tímpano de la señora Rodríguez García. El tribunal calculó que los disparos se hicieron a ocho pulgadas de su rostro." (Alegato P.G. 23.)

La defensa presentó prueba en el sentido de que el acusado estaba tomando una droga para rebajar y que el día en que ocurrió la muerte el acusado había estado ingiriendo bebidas alcohólicas. Un médico siquiatra que declaró por la defensa respondiendo a una pregunta hipotética en la que se le expuso la conducta del acusado horas antes de la llegada de su esposa y el hecho de que estaba tomando bebidas alcohólicas, manifestó que "el cuadro que Ud. pinta es un cuadro de una persona sicótica."

Fue declarado incurso en asesinato en segundo grado. Al dictar su fallo el juez expresó:

"La prueba presentada por usted es tendiente a demostrar un grado de intoxicación mediante pastillas y alcohol. Este Tribunal no es que esté convencido de que eso ocurrió, pero por lo menos, tiene una duda razonable en cuanto a si usted estaba o no bajo esos efectos. Una vez este Tribunal ha determinado eso, tiene que determinar qué tipo de delito ha cometido usted.

La mayoría de los Estados configura una persona que actúa en esa forma como un atenuante, no un eximente y dicen que el delito que usted comete es el de asesinato en segundo grado. Inclusive el libro que tan gentilmente el compañero me prestó, estuvimos examinando y en la página 345 del 'Criminal Law' de Wayne R. Lasave & Austin W. Scott establece ese hecho, donde dice que siempre es reconocido que el delito es el de segundo y que no debe ser utilizado para llevarlo hasta homicidio voluntario . . . ."[1]

---

[1] Así es en efecto lo expresado en la obra citada por el juez de instancia:

"Just as intoxication may negative some required intention or knowledge, so too it may negative the premeditation and deliberation which a common type of first degree murder statute requires. Just as one may be so emotionally upset, or in such a panic, or so mentally abnormal (though not insane), as to be incapable of premeditation and deliberation, so intoxica-

La tesis de la defensa es al efecto de que el haber ingerido ·bebidas alcohólicas mientras estaba tomando una droga para adelgazar inhibió a tal grado las facultades del acusado que lo incapacitaba para concebir la intención de matar con malicia premeditada, elemento indispensable en el delito de asesinato en segundo grado y que por tal razón lo procedente era declararlo culpable de homicidio voluntario. (²)

La doctrina invocada por el apelante ha sido aceptada por los estudiosos de esta fase del derecho penal. Weihofen & Overholser, *Mental Disorder Affecting Degree of Crime,*

tion may rob him of his capacity to premeditate and deliberate and thus reduce his crime from first degree to second degree murder. It is, generally, held, however, that intoxication cannot further reduce the homicide from second degree murder down to manslaughter . . . ."

(²) Atisbos de esta doctrina los encontramos en la expresión que hicimos en *Pueblo* v. *Rivera,* 70 D.P.R. 570-573 (1949), al interpretar el Art. 41 del anterior Código Penal, 33 L.P.R.A. sec. 87:

"La regla adoptada en aquellas jurisdicciones donde prevalecen disposiciones de ley idénticas o similares a la contenida en el artículo 41 de nuestro Código Penal es que la embriaguez—voluntaria—tiene que ser de tal grado o carácter que inhiba en el acusado su facultad mental para formar la intención específica requerida por el Código para la convicción de un delito—o grado del mismo—en el cual se requiera tal intención específica, y que la determinación de ese hecho es esencialmente una para el jurado o la corte juzgadora." (Citas omitidas.)

El Art. 41 del anterior Código Penal leía así:

"Embriaguez, Efecto de ésta. Ningún acto cometido por una persona en estado de voluntaria embriaguez es menos criminal por haberse cometido en tal estado. Pero siempre que la existencia real de algún fin, motivo o intento determinado fuere elemento indispensable para constituir alguna clase o grado de delito especial, el jurado podrá tomar en consideración el hecho de que el acusado se hallaba entonces ebrio, al determinar el fin, motivo o intento con que cometió el acto."

El artículo correspondiente del nuevo Código Penal, que es el Art. 33, lee así:

"La voluntaria embriaguez o la voluntaria intoxicación por drogas, sustancias narcóticas, estimulantes o deprimentes, o sustancias similares no exime de responsabilidad criminal. Pero siempre que la existencia real de algún fin, motivo o intención determinados fuere elemento indispensable para constituir alguna clase o grado de delito especial el juzgador podrá tomar en consideración el hecho de que el acusado se hallaba entonces ebrio o intoxicado, al determinar el fin, motivo o intención con que cometió el delito."

56 Yale L.J. 959 (1947); Diamond, *Criminal Responsibility of the Mentally Ill*, 14 Stan. L. Rev. 59–80 (1961); Taylor, *Partial Insanity As Affecting the Degree of Crime*, 34 Calif. L. Rev. 625 (1946) y ver además Nota: *Diminished Responsibility and Psychiatric Testimony in Pennslyvania*, 28 U. Pitt. L. Rev. 679 (1967); Masuti, *Psychiatric Testimony*, 33 U. Pitt. L. Rev. 650 (1972); Nota, 31 Dick. L. Rev. 100 (1966); Havel, *Diminished Capacity*, 18 U.C.L.A. L. Rev. 56 (1971); Cooper, *Diminished Capacity*, 4 Loyola U. of L.A. L. Rev. 308 (1971); Hasse, *California's Diminished Capacity*, 60 Calif. L. Rev. 1641 (1972); Comentario: *Diminished Capacity: The Middle Ground of Criminal Responsibility*, 15 Santa Clara L. Rev. 911 (1975); 2 Cipes, *Criminal Defense Techniques*, Sec. 32.02 *et seq.* (1972).

Hace ya casi un siglo la Corte Suprema de los Estados Unidos reconoció en el caso de *Hopt* v. *People*, 104 U.S. 631, 634 (1881), que "cuando un estatuto que establece distintos grados de asesinato requiere premeditación deliberada para que constituya asesinato en primer grado, la cuestión sobre si el acusado está en tal estado mental, por razón de embriaguez o por cualquier otro motivo, como para ser capaz de una premeditación deliberada, se convierte necesariamente en un asunto pertinente para ser considerado por el jurado."

La doctrina está predicada en la premisa de que debido a enfermedad o al uso de drogas o intoxicantes la capacidad mental se afecta en tal forma que la persona no es capaz de concebir la intención de matar con premeditación y deliberación requerida para calificar un homicidio de asesinato. La evidencia para establecer ese hecho debe ser aportada por peritos médicos y sicólogos. El jurado o el juez en su caso determina tomando en consideración las circunstancias relacionadas con el delito y la evidencia pericial presentada si en verdad el acusado carecía de la facultad para premeditar y deliberar. Leib, *Diminished Capacity: Its Potential Effect in California*, 3 Loyola U. of L.A. L. Rev. 153 (1970). Varias

jurisdicciones han emitido sendos dictámenes adoptando esta doctrina. *United States* v. *Brawner*, 471 F.2d 969 (D.C. Cir. 1972); *State* v. *Padilla*, 347 P.2d 312 (N.M. 1959); *State* v. *Ferrick*, 506 P.2d 860 (Wash. 1973); *State* v. *Cooper*, 213 S.E.2d 305 (N.C. 1975); *Washington* v. *State*, 85 P.2d 509 (Neb. 1957); *Johnson* v. *Commonwealth*, 115 S.E. 673 (Va. 1923). Pero véase *Bethea* v. *United States*, 365 A.2d 64 (1976).

Si bien en algunas jurisdicciones se ha adoptado la doctrina en la extensión propuesta por el apelante en el sentido de que la inhibición de las facultades mentales por el efecto del alcohol incapacitan para concebir la malicia premeditada, que es elemento necesario del asesinato en segundo grado, *People* v. *Conley*, 411 P.2d 911 (Calif. 1966); *People* v. *Berry*, 556 P.2d 777 (Calif. 1976); *State* v. *Santiago*, 516 P.2d 1256 (Hawaii 1973); *State* v. *Green*, 6 P.2d 177 (Utah 1931), la mayoría de dichas jurisdicciones limitan sus efectos a reducir la modalidad del delito de asesinato en primer grado a asesinato en segundo grado. *United States* v. *Brawner*, supra; *Commonwealth* v. *Walzack*, 360 A.2d 914 (Pa. 1976); ver Anotación, *Criminal Law: Mental or Emotional Condition as Diminishing Responsibility for Crime*, 3 A.L.R.3rd 1228 (1968).

La razón para esta limitación en la aplicación de la doctrina se resume con precisión en lo expresado por Weihofen and Overholser, *Mental Disorder Affecting the Degree of Crime*, 56 Yale L. J. 959 (1947) a la pág. 969:

"La distinción entre asesinato y homicidio tiene una historia totalmente diferente y está basada en criterios enteramente distintos a los utilizados entre diversos grados de asesinato. Aquél pertenece al derecho común, éste al estatutario; el primero envuelve un criterio objetivo, el segundo uno subjetivo. La provocación que en el derecho común reduce un asesinato a homicidio deberá ser aquella que produzca cólera o pasión en un hombre razonable, o sea, un hombre promedio con dominio ordinario de sí mismo. A menos que cumpla con esta norma objetiva de razo-

nabilidad, el hecho objetivo del estado pasional no convierte dicha muerte en homicidio. Factores tales como anormalidad mental o intoxicación son, por lo tanto, irrelevantes, puesto que la norma de 'hombre razonable' presupone un hombre cuerdo o sobrio."

Ver además *State* v. *McAllister*, 196 A.2d 786 (N.J. 1964); *United States* v. *Brawner*, 471 F.2d 969, escolio 75 a la pág. 1002 (D.C. Cir. 1972).

Coincidimos con el criterio de los dictámenes que sostienen que la incapacidad mental que puede producir el uso de drogas y bebidas alcohólicas para cambiar un designio criminal sólo tiene el efecto de reducir el grado del delito, de asesinato en primer grado a asesinato en segundo grado.

Actuó correctamente el tribunal de instancia al determinar que el delito cometido por el acusado era el de asesinato en segundo grado.

*Se confirmará la sentencia apelada.*

El Juez Presidente Señor Trías Monge concurre en el resultado. El Juez Asociado Señor Rigau no intervino.