EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* MANUEL FEBRES RIVERA y FELIPE ROBLES PÉREZ, acusados y apelantes.

Número 15993.

*Sometido:* 1 de noviembre de 1955. *Resuelto:* 27 de enero de 1956.

---

*Manuel López Carrillo y Juan Nevares Santiago,* abogados, respectivamente, de los apelantes; *Hon. Secretario de Justicia Interino Juan B. Fernández Badillo,* y *Rafael L. Ydrach Yordán* y *Ramón Olivo Nieves, Fiscal* y *Fiscal Especial, respectivamente, del Tribunal Supremo,* abogados de El Pueblo, apelado.

El Juez Asociado Señor Sifre emitió la opinión del Tribunal.

A los apelantes se les procesó en el Tribunal Superior, Sala de Humacao, por el delito de asesinato en primer grado. La causa fué vista ante jurado. Éste les declaró culpables de asesinato en segundo grado, y ambos fueron sentenciados a la pena de diez a quince años de presidio. Apelaron y apuntan cuatro errores en apoyo del recurso.

En el primer señalamiento aseveran que erró la Sala sentenciadora al "denegar la petición . . . de que se rebajara la calificación del delito . . .". Se les imputó a los apelantes que ". . . el día 16 de agosto de 1953 . . . ilegalmente, con ma-

licia expresa, premeditación y deliberación, manifestando la intención premeditada de ilegalmente quitar la vida a un semejante, acometieron y agredieron al ser humano Juan Osorio Ramos, con un instrumento contundente produciéndole heridas que le ocasionaron la muerte el día 17 de agosto de 1953".

Hace el fiscal el siguiente resumen—sustancialmente correcto—de la prueba presentada por el Pueblo para sostener la acusación:

"El Dr. Eduardo Rodríguez Pérez fué el primer testigo que presentó el ministerio fiscal. Declaró que a eso del mediodía del 17 de agosto de 1953 atendió en la Sala de Emergencia del Hospital de Distrito de Fajardo a Juan Osorio Ramos quien estaba inconsciente, hablando en forma incoherente, moviendo todas sus extremidades; que al examinarlo encontró que tenía una hematoma periorbitaria de ambos ojos y además sangre coagulada alrededor de la nariz y de la boca. Mostraba una laceración de una pulgada de longitud en la región temporo-occipital izquierda y la cara estaba verde abotargada, cianótico. De las múltiples lesiones recibidas se tomaron radiografías del cráneo y demostraba que había una gran fractura con depresión en la región temporal izquierda y fractura del arco sigomático izquierdo que se extendía a la fosa temporal izquierda. El paciente, que fué llevado a la institución a las 10:30 de la mañana del día 17 de agosto murió a las 7:30 de la noche de ese mismo día. Al hacer la autopsia, y abrir la cavidad craneana al nivel del cuero cabelludo se encontró una extensa hematoma que se extendía al largo de todo el epicráneo izquierdo y la calota epicraneana, o sea, el cuero cabelludo del lado izquierdo desde la frente hasta la región occipital. Había otra hematoma extensa de la región occipital derecha, o sea, la parte atrás de la cabeza y en el otro lado a todo lo largo, cerca del músculo temporal presentaba una hematoma muy grande. Al levantarse el músculo se encontró una fractura con depresión de la región temporo-parietal izquierda de cinco por dos centímetros de diámetro, o sea, dos por una pulgada, de cuyo polo anterior partía una fractura lineal de unos tres centímetros de longitud que se perdía en la fosa temporal izquierda. En la bóveda craneana se encontró sangre líquida, o sea, hematoma subdural consistente en alrededor de veinte a veinticinco

centímetros cúbicos de sangre. La muerte se debió sin lugar a dudas al *shock* secundario a la hemorragia cerebral extensa.

"En la repregunta explica lo que significa una hematoma reciente y dice que es algo en donde se ve la extravasación de la piel que puede continuar por 48 horas. La hematoma que presentaba la víctima pudo haber sido producida dentro de las primeras 24 horas o 48 horas a lo sumo. Afirma enfáticamente que ese golpe que presenta rotura de depresión en el cráneo jamás pudo haber sido producido por un puñetazo. Sostiene sin embargo, que puede ser ocasionada como consecuencia del puñetazo o puñetazos recibidos. Al hacer el examen físico del paciente notó en él aliento alcohólico.

"En el redirecto afirma él que las lesiones producidas pudieron haber sido consencuencias de caerse sobre una piedra o pudieron haber sido ocasionadas por un palo o con un tubo.

"Agapito Ortiz Rivera declaró que es el Administrador de la Colonia Fortuna, finca de la Autoridad de Tierras que queda entre Luquillo y Palmer y que el 17 de agosto de 1953 vió en la entrada de esa colonia a un hombre muy golpeado.

"Camilo Robles Meléndez declaró que tiene 17 años de edad y que es primo de Felipe Robles Pérez, uno de los acusados y que conoce también a Manuel Febres; que el día 16 de agosto de 1953 él despachaba en una tienda que queda a mano izquierda de Luquillo para Río Grande. Esa tienda queda al lado del balneario de Luquillo. Ese día como de seis a siete vió a los dos acusados en esa tienda. Ellos estaban en un carro Packard manejado por Manuel Febres e invitaron al testigo a dar una vuelta a las Parcelas Fortuna; que él y su hermano Gabino Robles montaron en el carro. De allí los cuatro fueron al Bar Yukery donde se tomaron cuatro cervezas y de allí pasaron al Bar de Pepín donde Manuel Febres compró una botella de Ron Cacique. De ahí fueron a Luquillo y dieron varias vueltas por el pueblo. Ese día era domingo. Estacionaron el carro alrededor de la plaza frente al Bar de Tempo y ahí Felipe Robles, el otro acusado, compró una botella de ron Superior. De ahí salieron para las parcelas y se detuvieron en el Bar de Sira Guerra de donde regresaron a Luquillo y se detuvieron otra vez en el Bar de Tempo. Fué aquí que Felipe Robles Pérez bajó del automóvil y entró al bar y allí estaba Juan Osorio, parado en la puerta. Felipe le dijo a él que le había hecho una mala acción. A esto Juan Osorio le contestó que no sabía por qué le había dicho eso. Juan Osorio abandonó el sitio y se fué

hacia la plaza y Felipe Robles le siguió. En la plaza estaba el policía Martínez quien les dijo que se fueran. Eso se lo dijo el policía Martínez a Felipe y a Juan Osorio. Los demás ocupantes del vehículo montaron a Felipe Robles en el carro. Después de dar otras vueltas por Luquillo salieron en dirección a Palmer. Cerca de una tienda estaba Juan Osorio quien mandó a parar el carro y solicitó que lo llevaran a las parcelas. Osorio no pudo ver a Manuel Febres porque ya era de noche y el carro no tenía luz. Juan Osorio se sentó en el asiento de atrás del carro entre el testigo y su hermano. Eso ocurrió como a las nueve de la noche y el carro no tenía luz adentro. Al entrar Juan Osorio al automóvil los acusados no dijeron nada y siguieron en dirección a las parcelas. Cerca de una escuelita Juan Osorio solicitó que lo dejaran allí, pero los acusados siguieron marcha y fueron a detenerse al lado de un callejón obscuro en la Colonia Fortuna, que queda a la mano izquierda en la carretera que va de Luquillo hacia Palmer y Río Grande y San Juan. Al detener el vehículo se apeó Felipe Robles y después Juan Osorio. El segundo dijo que si lo habían traído para darle. Acto seguido Felipe Robles le dió un puñetazo y lo tumbó. Mientras tanto, Manuel Febres abandonó el carro con un tubo en la mano y le entró a golpes a Juan Osorio. Felipe Robles le quitó el tubo a Manuel Febres y también le dió unos golpes a Juan Osorio. Tanto el testigo como su hermano trataron de intervenir pero los acusados se lo impidieron y Felipe Robles Pérez se expresó en el sentido de que "a éste lo tengo que matar yo". Juan Osorio estaba en el suelo mientras los acusados le daban con un tubo. Los acusados y sus dos acompañantes se montaron de nuevo en el carro y en vez de regresar para Luquillo siguieron en dirección a San Juan y se detuvieron en el Restaurant Cardona. Aquí amenazaron al testigo quien se quedó en ese restaurant.

"En el contrainterrogatorio Camilo Robles Meléndez dice ser también pariente del otro acusado Manuel Febres Rivera. Se reafirma en el hecho de que después que los acusados le propinaron los golpes a Juan Osorio se detuvieron en el Bar Cardona. Sostiene que no dijo nada de lo ocurrido a nadie porque los acusados le habían amenazado. Vuelve a narrar paso por paso, con todo detalle y sin variación de clase alguna las andanzas de los acusados en o alrededor de Luquillo desde

las seis de la tarde del día 16 hasta el momento en que los acusados agredieron a la víctima y la abandonaron." (¹)

Al terminar El Pueblo de presentar su prueba, los procesados, que no ofrecieron ninguna, solicitaron del tribunal sentenciador que rebajara la calificación del delito de asesinato en primer grado a homicidio voluntario, fundándose en que el único testigo presencial de los hechos, Camilo Robles Meléndez, había hecho referencia en su testimonio a una "garata" entre ellos y el occiso. Ahora se quejan de que tal solicitud fuera denegada. Es obvio que dicho tribunal actuó acertadamente al no acceder a las pretensiones de la defensa, puesto que era el jurado el llamado a determinar la clase de delito perpetrado por los inculpados, de concluir que estos habían incurrido en responsabilidad penal por haber ocasionado la muerte de Osorio Ramos. (²)

Aseveran los apelantes, por vez primera ante nos, que la Sala de instancia "para resolver que el único delito cometido . . .", de haberse cometido alguno, "fué el de Homicidio Voluntario", debió tomar en consideración el que ellos, Osorio Ramos y Robles Meléndez, habían ingerido bebidas alcohólicas—los primeros, los apelantes, "abundantemente" y el último "en demasía"—con anterioridad a los sucesos que dieron lugar a que se les procesara. Cuando la embriaguez —voluntaria—del encausado, no la embriaguez de la víctima ni la de los testigos, amerita consideración para el propósito limitado a que se alude en la segunda oración del art. 41 del Código Penal, el juzgador de los hechos—jurado o tribunal de derecho—es el que tiene poder para considerar ese factor, *Pueblo* v. *Rivera*, 70 D.P.R. 570; *Pueblo* v. *Rosado*, ante

---

(¹) Al resumen de la declaración de Camilo Robles debemos añadir que éste testificó que descendió del automóvil "cuando la garata de ellos", aludiendo a una "garata" en la que intervinieron los apelantes y Juan Osorio Ramos, y que en el período de la repregunta declaró que el último bajó del vehículo antes de que lo hiciera Felipe Robles, uno de los acusados.

(²) La corte a quo dió instrucciones al jurado sobre asesinato en sus dos grados, y sobre el delito de homicidio voluntario.

pág. 436.(³)   El proceso contra los apelantes, se vió, como hemos dicho, ante jurado.   No tenemos que decidir si la embriaguez—voluntaria—del inculpado al perpetrar el delito, circunstancia que sin duda alguna puede tomar en consideración el juzgador para rebajar el asesinato en primer grado a asesinato en segundo grado, puede igualmente considerarse para descartar ese último delito y rendir un veredicto por homicidio voluntario, cuestión acerca de la cual no están contestes los precedentes judiciales.   En el caso de autos la única prueba que fué presentada, la del ministerio público, reveló que los apelantes antes de atacar a Osorio Ramos estuvieron ingiriendo bebidas alcohólicas, pero no demostró que se encontraran en estado de embriaguez al realizar el ataque.   La embriaguez a que se refiere el art. 41 del Código Penal, debe ser de tal naturaleza que incapacite al procesado para formar o concebir el propósito, la intención, o la malicia que según la ley es elemento o ingrediente indispensable del delito. Sobre ese extremo nos expresamos así en *Pueblo* v. *Rivera,* supra;  "La regla adoptada en aquellas jurisdicciones donde prevalecen disposiciones de ley idénticas o similares a la contenida en el art. 41 de nuestro Código Penal—es que la embriaguez voluntaria—tiene que ser de tal grado o carácter que inhiba en el acusado su facultad mental para formar la intención específica requerida por el Código para la convicción de un delito—o grado del mismo—en el cual se requiera la intención específica . . .".

Se quejan los apelantes en el segundo señalamiento de que el veredicto "es contrario a derecho y a la prueba . . .". No discuten el error apuntado.   El examen que de todos modos hemos tenido que hacer de los autos nos deja convencidos de que no tienen razón.

---

(³) Dispone el art. 41 del Código Penal que "Ningún acto cometido por una persona en estado de voluntaria embriaguez es menos criminal por haberse cometido en tal estado.   Pero siempre que la existencia real de algún fin, motivo o intento determinado fuere elemento indispensable para constituir alguna clase o grado de delito especial, el jurado podrá tomar en consideración el hecho de que el acusado se hallaba entonces ebrio, al determinar el fin, motivo o intento con que se cometió el acto."

En vista de la evidencia que fué presentada al jurado, no puede prosperar la contención, objeto del tercer señalamiento, al efecto de que debió anularse el veredicto por no haberse demostrado la conexión de los procesados con el acto delictivo.

Asevérase en el cuarto y último apuntamiento que incurrió en error el tribunal a quo "al negarse a disolver al jurado", por razón de ciertos comentarios hechos en su presencia por el tribunal y por el representante del ministerio público. Este último expuso en su informe que un veredicto de homicidio voluntario significaría un triunfo para la defensa y que de ser ese el veredicto consideraría que había perdido el caso. A esas manifestaciones contestó lo siguiente el magistrado que presidía la Sala de instancia: "El tribunal entiende que si viene un veredicto después que el tribunal dé las instrucciones, es un buen veredicto". Afirman los apelantes que lo dicho por el fiscal influenció al jurado en su contra, y que lo manifestado por la corte a quo les privó de toda posibilidad de ser absueltos, por cuanto a aquél se le informó que sería bueno un veredicto por el delito de homicidio voluntario. Carecen de importancia las manifestaciones del representante del ministerio público, de las que, entre paréntesis, no protestó la defensa cuando fueron hechas. Los apelantes no han demostrado que sufrieran perjuicio alguno por razón de las mismas. No podemos estar de acuerdo con que lo expresado por el tribunal sentenciador llevó al ánimo del jurado la creencia de que no podía rendir un veredicto absolutorio si a su juicio procedía. Dicho tribunal antes de empezar a trasmitir las instrucciones, comunicó al jurado lo siguiente: ". . . con motivo de este incidente que ha pasado ahora, este Juez hizo la aseveración o manifestación de que si Uds. traían un veredicto de homicidio voluntario, era un buen veredicto. Yo quiero decir de estas palabras que no pueden ser tomadas por Uds. en forma alguna para influir su veredicto. Esos dos individuos son inocentes hasta que Uds., los juzguen y determinen con la prueba presentada, si son inocentes o son culpables". También fué informado el

jurado que de entender "que no se ha probado el delito, que el Fiscal no ha probado su caso, o si tienen duda, fundada y razonable, en cuanto a la culpabilidad de estos acusados, entonces, en cualquiera de estos casos, podéis absolverlos."

*Las sentencias apeladas deberán ser confirmadas.*