EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* ALFONSO LUIS OTERO ALEJANDRO, acusado y apelante.

*Número:* CR-79-24  *Resuelto:* 20 de junio de 1980

*Luis A. Amorós* y *Sebastián J. Carlo,* abogados del apelante; *Héctor A. Colón Cruz, Procurador General,* y *Ricardo E.*

*Alegría Pons, Procurador General Auxiliar,* abogados de El Pueblo.

PER CURIAM: Se trata de un caso clásico de asesinato en primer grado.

Las partes estipularon la capacidad del Doctor Rafael Criado para declarar como perito médico. La prueba aportada por él, la cual no fue atacada ni controvertida por la defensa, demostró que la víctima recibió diez u once tiros. Su cuerpo presentaba 21 agujeros. Tres de los tiros eran mortales. Le atravesaron el corazón y los dos pulmones.

Sobre los hechos criminosos en sí desfiló prueba de cargo y de defensa. La prueba creída por el jurado, en lo esencial, demostró lo siguiente:

La víctima, Miguel A. Fernández, trabajaba en el Banco de Ponce y vivía en Hato Rey, Puerto Rico. Estaba divorciado de Sonia E. Martínez Díaz, y tenían un hijo, el cual vivía con la madre.

El día de los hechos, el 22 de julio de 1978, la víctima había hablado por teléfono con su ex-esposa y ella le pidió que le trajese unos litros de leche para el niño. Ese día como a las 8:30 de la noche la víctima llegó en su automóvil a la casa de su ex-esposa y el niño avisó a su madre diciéndole que su papá había llegado. Ella se asomó por la ventana y efectivamente vio cuando Fernández se bajó del automóvil. En ese momento una guagua de las llamadas *panel delivery* se detuvo y la señora Martínez vio cuando de la cabina de la guagua salió un rifle e hizo una serie de disparos. Luego la guagua se fue rápidamente. Cuando ella bajó, la víctima estaba tirada en la grama; la señora Martínez consiguió ayuda y llevaron a Fernández al Centro Médico. Allí le informaron que éste había muerto. Fernández no estaba armado ni en su sangre había alcohol.

En la tarde de ese día, el testigo Francisco Lacén llegó a su casa, se bañó y se cambió de ropa y se fue a un establecimiento público conocido por "El Greco". Allí estaban

"Papo", el apelante, y otro individuo llamado Henry. Eso ocurría como a las 6:30 de la tarde o un poco después. Al negocio llegó otro individuo conocido por "El Esgollao" y dirigiéndose a Papo y a Henry les dijo "Que si ellos iban a estar toda la noche para hacer una tontería como ésa; que si ya no se podía contar con ellos". A eso Henry contestó "que lo iban a hacer". Papo y Henry se inyectaron una dosis de droga y se proponían salir cuando el testigo Francisco Lacén les preguntó que para dónde iban y Henry contestó que iban a hacer "un trabajito". Lacén preguntó si él podía ir. Papo y Henry se miraron, se sonrieron y le dijeron que sí.

Los tres se montaron en la guagua. Papo la conducía. Henry se montó en el asiento delantero al lado del conductor y Lacén se montó en la parte de atrás de la guagua. Allí notó que había algo dentro de dos patas de pantalones. Declara que salieron de viaje y luego se dio cuenta de que iban persiguiendo un automóvil. Relata las calles y las avenidas por las cuales transitaron. Notó que por donde el automóvil cogía, ellos también cogían. Al llegar a determinado sitio, Henry le dijo a Papo: "¡párate, párate!". Sacó el rifle que tenía envuelto en las patas de unos pantalones y comenzó a disparar hacia afuera. Disparó diez o doce veces. Inmediatamente le gritó a Papo: "¡embolla, embolla!".

Ya de regreso al Caserío Ramos Antonini, en donde el apelante vivía, se bajaron y Henry se llevó el rifle. Le dejaron la guagua a Lacén y le dijeron que la botara. Lacén se quedó con ella y al otro día la Policía lo arrestó.

La prueba de la defensa consistió en prueba de coartada y puede resumirse como sigue. El acusado tenía un automóvil Camaro del año. Vivía en el Caserío Ramos Antonini. Vivía con una muchacha llamada Carmen Gertrudis Corchado, pero no estaban casados. No trabajaba y llevaba un año cogiendo desempleo. En la noche de los hechos él y su concubina se habían ido para las fiestas patronales de Río Grande. Que como a medianoche regresaron a San Juan y fueron a

una discoteca y "allí disfrutaron y bebieron" y se regresaron a su casa como a las 4:30 de la madrugada.

Elba Correa de Matos, la Secretaria de la Asamblea Municipal de Río Grande, declaró que para el día de los hechos, el 22 de julio de 1978, no había fiestas patronales en Río Grande. Ni machinas ni kioskos. Las fiestas se habían celebrado del 7 al 16 de julio y se habían terminado.

El apelante hace los siguientes dos señalamientos de error: (1) Que erró el tribunal al entrar a juicio sin estar la defensa preparada y al aumentarle la fianza al acusado, y (2) que erró el tribunal al denegar la solicitud de que impartiese instrucciones con respecto a embriaguez o intoxicación por drogas y sobre el delito de asesinato en segundo grado.

El primer señalamiento carece de seriedad. Los hechos demuestran que el apelante tuvo amplia oportunidad para preparar su defensa. Los delitos se cometieron el 22 de julio de 1978. Se determinó causa probable el 24 de ese mes y el apelante fue arrestado el 26. La vista preliminar se celebró el 18 de octubre de ese año. Se formuló acusación el 27 de octubre y se le dio lectura a la misma el 2 de noviembre. Se señaló el juicio para el 14 de diciembre de 1978, pero se pospuso para el día 21 de ese mes. El 21 compareció el apelante con su abogado, pero éste expresó no estar preparado. El tribunal pospuso la vista para el 20 de febrero de 1979 y en esa fecha la defensa volvió a repetir que no estaba preparada. Alegó que no había podido entrevistarse con el acusado. En esa ocasión el tribunal le aumentó la fianza. Defensa y acusado se entrevistaron, pero la defensa insistió en que no estaba preparada. Se pospuso el juicio nuevamente para el 23 de febrero de 1979. Ese día se seleccionó el jurado y se señaló la continuación del caso para el 26 de febrero. En esa fecha las partes manifestaron estar preparadas y declaró el perito médico que practicó la autopsia. La prueba de cargo continuó presentándose el día siguiente, y el 28 de febrero la defensa comenzó la presentación de su prueba.

De lo anterior surge que entre el arresto y la fecha en que comenzó el desfile de la prueba transcurrieron siete meses. El apelante ya tenía abogado para el 2 de noviembre de 1978, o sea, aproximadamente cuatro meses antes de celebrarse el juicio. No se cometió error al denegar la última suspensión solicitada.

■ Tampoco constituye error el aumento de la fianza. La Regla 218(c)(1) de Procedimiento Criminal expresamente autoriza al magistrado "para aumentar o reducir la fianza cuando a su juicio las circunstancias lo ameriten". El cuadro de hechos antes relacionados y la aparente despreocupación del apelante y de la defensa de prepararse para el juicio, podían muy bien hacer pensar al magistrado que las circunstancias ameritaban dicho aumento. No se justificaría revocar la sentencia por esa determinación del magistrado, pasajera y sin mayor consecuencia. Por el contrario, el resultado fue que eso permitió que el abogado pudiese entrevistar al acusado.

En cuanto al segundo señalamiento, la situación tampoco justifica una revocación. La acusación fue por asesinato en primer grado y la prueba la sostiene ampliamente. El apelante participó fría y calculadamente en un asesinato planeado de antemano. El Art. 82 del Código Penal dispone que "[a]sesinato es dar muerte a un ser humano con malicia premeditada". Hemos dicho que el asesinato en primer grado requiere malicia premeditada y deliberada. La prueba demuestra exactamente eso. *Pueblo* v. *Barriera González*, 89 D.P.R. 772 (1964); *Pueblo* v. *Pérez Martínez*, 84 D.P.R. 181 (1961); *Pueblo* v. *Rosario*, 67 D.P.R. 371 (1947); y *Pueblo* v. *Torres*, 75 D.P.R. 231 (1953).

■ Tampoco constituyó error el no dar instrucciones sobre intoxicación por drogas. El Art. 33 del Código Penal, 33 L.P.R.A. sec. 3155, autoriza a considerar intoxicación por drogas a los fines de determinar el motivo o intención con que

se cometió el delito. Pero, en primer lugar, en el caso de autos la teoría de la defensa fue la de coartada y el jurado no la creyó.

No hubo prueba alguna que tendiese a establecer que la heroína intoxicó al apelante en tal forma que hubiese inhibido sus facultades mentales de manera que no fuese responsable de sus actos. El propio Art. 33 antes citado dispone que la voluntaria embriaguez o intoxicación por drogas no exime de responsabilidad criminal. La capacidad de los asesinos no fue alterada por la droga. La prueba demostró que el apelante y su cómplice tenían planeado un asesinato y lo llevaron a cabo según su plan. Además, al momento de cometerlo, se preocuparon por huir rápidamente del lugar de los hechos, lo cual demuestra que gozaban de claridad mental en aquel instante y que estaban conscientes de que acababan de cometer un delito. *Pueblo* v. *Caballero Rodríguez*, 109 D.P.R. 126 (1979); *Pueblo* v. *Méndez Ramos*, 108 D.P.R. 59 (1978); *Pueblo* v. *Belmonte Colón*, 106 D.P.R. 82 (1977); *Pueblo* v. *Valentín Acevedo*, 97 D.P.R. 272, 277 (1969); *Pueblo* v. *Díaz Díaz*, 91 D.P.R. 759, 764 (1965); y *Pueblo* v. *Febres*, 78 D.P.R. 893, 899 (1956).

Sería erróneo y un contrasentido interpretar el Art. 33 del Código Penal en el sentido de que en los casos de asesinato en primer grado sostenido ampliamente por la prueba, fuese eximente el mero uso de bebidas o de drogas. Eso garantizaría la impunidad del delincuente.

*No habiéndose cometido los errores señalados, se confirmarán las sentencias apeladas.*