EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* VÍCTOR M. CHÉVERE, acusado y apelante.

*Número:* CR-77-87      *Resuelto:* 31 de octubre de 1978

*Ramón A. Sánchez Gómez,* abogado del apelante; *Héctor A. Colón Cruz, Procurador General,* y *Miguel A. Santana Bagur, Procurador General Auxiliar,* abogados de El Pueblo.

SENTENCIA

Supuestamente motivado por una conducta reprochable atribuida a Rubén Maldonado delante de la esposa y los hijos de Jaime Torres, éste solicitó de José A. Sánchez que localizara a Maldonado.

Maldonado fue ultimado de un balazo en la cabeza con orificio de entrada por detrás y salida por la frente. El tiro fatal lo disparó Edilberto Jurado, amigo de Torres. Fueron acusados de asesinato en primer grado Torres, Jurado y Chévere un individuo que estuvo presente en la ejecución pero que no tuvo participación activa en la misma. Sánchez fue el único testigo de los hechos presentado por el fiscal en el caso contra Chévere. Torres y Jurado se declararon culpables.

Para revisar el veredicto del jurado que declaró a Chévere culpable de asesinato en segundo grado, apunta el apelante "que dicho veredicto es contrario a derecho y a la prueba" y que el tribunal erró "al negarse a impartir instrucciones especiales solicitadas . . . sobre la figura jurídica del co-autor siendo las mismas de especial importancia por la base de la prueba presentada y el estado de derecho actual de acuerdo a la jurisprudencia establecida" y erró asimismo "al no instruir a los miembros del jurado sobre el efecto de la embriaguez y la responsabilidad criminal."

Con motivo de la conducta atribuida a Maldonado frente a la esposa e hijos de Torres, éste le pide a Sánchez que lo localice. Sánchez lo consigue y lo lleva a donde Torres, quien estaba con sus amigos Edilberto Jurado y el apelante Chévere. Todos los personajes que participaron en este crimen eran pacientes de la clínica de metadona. Luego de tomar varias cervezas en distintos sitios y con la excusa de ir a buscar unas llantas de automóvil, todos se dirijen a Guavate: Sánchez, Torres, Jurado, Chévere y Maldonado. Descienden de los vehículos y entran en el monte. Torres le pasa un arma de fuego a Jurado. Delante van Maldonado, Sánchez y Chévere. Al instante se oyeron dos detonaciones. Regresaron a sus vehículos. Cuando salen a la carretera Torres le dice a Jurado "que qué lo mataste, lo tumbaste [y Jurado contesta] olvídate, eso es lo mío." Maldonado fue encontrado en el monte de Guavate tiempo después, en proceso de descomposición. Presentaba una herida de bala en la cabeza con orificio de entrada por la parte posterior.

Sánchez declaró que el apelante no participó en forma alguna en los actos delictivos, y que estuvo al lado de él en todo el tiempo.

La prueba de la defensa explica la presencia del apelante en la escena del crimen. Esta se debió a que había pedido pon hasta su casa y siguió con ellos. Alega, además, que estaba en un estado físico (embriaguez) que no se daba cuenta de lo que ocurría a su lado.

Consideremos conjuntamente los dos primeros errores, según los discute el apelante.

1. "Erró el Tribunal al aceptar el veredicto condenando al acusado-apelante por el delito de asesinato en segundo grado ya que dicho veredicto es contrario a derecho y a la prueba."

2. "Erró el Honorable Tribunal al negarse a impartir instrucciones especiales solicitadas por la defensa sobre la figura

jurídica del co-autor siendo las mismas de especial importancia por la base de la prueba presentada y el estado de derecho actual de acuerdo a la jurisprudencia establecida por esta honorable superioridad."

La prueba presentada conecta a Chévere con el delito imputado. Acompañó al grupo antes y después del crimen. El juez al instruir al jurado les hizo claro que: "[s]i se les demuestra a ustedes, Damas y Caballeros del Jurado fuera de duda razonable que estos acusados mencionados en la acusación se unieron para realizar o ejecutar el acto que se le imputa al acusado y que todos contribuyeron a la comisión del delito, aun cuando uno solo produjera el resultado o sea, produjera la muerte en este caso, ante la ley todos son responsables del mismo delito. *Pero si la unión de todos los acusados en la realización o ejecución del acto no se demostrare, entonces la responsabilidad habrá de recaer sobre aquellos que actuaron conjuntamente, o aquél que lo realizó por sí solo.*"

Esta instrucción adecuadamente protegía la posición del apelante. En manos del jurado quedaba el determinar si la conducta de Chévere lo convertía en un co-autor o si por el contrario le daba crédito a la prueba que establecía que él no estaba consciente de lo que estaba pasando a su lado.

El jurado dirimió el conflicto y declaró culpable al apelante. No estamos justificados en alterar esa determinación.

3. "Erró el Hon. Tribunal al no instruir a los miembros del jurado sobre el efecto de la embriaguez y la responsabilidad criminal del acusado."

El apelante fue acusado de asesinato en primer grado y el jurado lo declaró culpable de asesinato en segundo grado. Aunque el juez no instruyó al jurado sobre su condición, como el jurado lo declaró culpable de asesinato en segundo grado, la omisión carece de trascendencia. A ese efecto expresamos en *Pueblo* v. *Belmonte Colón,* 106 D.P.R. 82 (1977) : "Coinci-

dimos con el criterio de los dictámenes que sostienen que la incapacidad mental que puede producir el uso de drogas y bebidas alcohólicas para cambiar un designio criminal solo tiene el efecto de reducir el grado del delito, de asesinato en primer grado a asesinato en segundo grado." Precisamente eso.fue lo que hizo el jurado.

Se confirma la sentencia apelada.

Así lo pronunció y manda el Tribunal y certifica el Secretario. El Juez Asociado Señor Irizarry Yunqué emitió voto disidente.

(*Fdo.*) Ernesto L. Chiesa

*Secretario*

—O—

Voto disidente del Juez Asociado Señor Irizarry Yunqué.

San Juan, Puerto Rico, a 31 de octubre de 1978

He leído con detenimiento la exposición narrativa de la prueba y no me parece satisfactoria en Derecho para sostener la convicción del apelante. La prueba de cargo no estableció que el apelante se uniera a los que proyectaban asesinar a la víctima con conocimiento de su propósito, ni que adquiriera tal conocimiento luego de estar con ellos y consintiera voluntariamente en participar. Falta la prueba del "concierto y común acuerdo" que se le imputó en la acusación.

No puede pasarse por alto que la prueba de defensa explicó la presencia del apelante en la vecindad del lugar de los hechos. El testimonio del testigo Jaime Torres fue a este respecto convincente, prolijo en detalles que fortalecen su veracidad, y que no pudieron ser desvirtuados pese al hábil contrainterrogatorio del experimentado fiscal Sr. Rossner. Ese

testimonio no fue contradicho, no es inverosímil ni improbable, y debió merecer peso.

Es de notar que la única prueba que relaciona al apelante con la comisión del delito es el testimonio de un cómplice que, si bien no tiene que ser corroborado, debe tomarse con desconfianza. Regla 156 de Procedimiento Criminal, Instrucciones al Jurado para el Tribunal Superior de Puerto Rico, pág. 47 (1976). A este cómplice, que sí tenía conocimiento del plan y fue quien buscó a la víctima por encargo del autor intelectual del crimen y la puso a su disposición, se le ofreció inmunidad y se le hizo testigo de cargo para poder enjuiciar al apelante. Aun así su testimonio, aparte de ser débil, tendió más bien a exculparle. Ello surge de la propia relación que se hace en la sentencia. Al examinarse la exposición de la prueba, esto se hace más patente.

Se dirá que el jurado dirimió los conflictos en la prueba y que no debemos intervenir en su apreciación de la misma. *Pueblo* v. *Rosario Cintrón*, 102 D.P.R. 82 (1974); *Pueblo* v. *Villalongo Torres*, 102 D.P.R. 574 (1974). Creo en esta norma. Pero no es absoluta. No nos está vedado examinar la prueba y aquilatar su valor probatorio en Derecho. *Pueblo* v. *Carrasquillo Carrasquillo*, 102 D.P.R. 545, 551 (1974). No podemos ignorar la realidad de que los jurados, como humanos, se equivocan, y a veces sus fallos no responden necesariamente al valor probatorio de los testimonios vertidos ante ellos. Otras cosas pueden influir en ellos. Y aquí hay muchas. Por ejemplo, ¿qué valor probatorio tenía mostrar al jurado la calavera del occiso y su caja de dientes? Identificado el cadáver debidamente y establecida pericialmente la causa de la muerte, ¿a qué fin legítimo, que no fuera impresionar al jurado, conducía mostrarle tales cosas macabras? Además, consciente el jurado de que Jaime Torres, autor intelectual del crimen, y Edilberto Jurado, la persona que hizo el disparo,

ambos confesaron su culpabilidad y fueron convictos, y de que el otro participante—José A. Sánchez—persona que llevó a la víctima para ser ejecutada fue hecho testigo del fiscal, precisamente para poder enjuiciar al aquí apelante, ¿no es de esperarse que esas circunstancias pesaran en la mente del jurado?

Por último, el apelante no declaró en el juicio. Tenía derecho a ello y así lo instruyó el juez. ¿Es de esperarse que seamos tan cándidos como para creer que esa circunstancia no pesa en el ánimo del jurado? La pregunta que siempre queda latente es, ¿por qué, si él mejor que nadie sabe que es inocente, no declara?

No señalo que todas estas circunstancias deben en todos los casos movernos a revocar sentencias condenatorias. Creo, sin embargo, que como personas de experiencia y con conocimiento de la naturaleza humana no podemos pasarlas por alto frente a una prueba floja, débil, e indigna de confianza como la aportada en este caso para sostener un fallo de asesinato.

Revocaría la sentencia.